## COMMISSIONER OF TRANSPORTATION *v.* GARY SHEA ET AL.

Superior Court      Judicial District of      File No. CV00-0598584S
Hartford

Memorandum filed March 11, 2002

*Robert T. Morrin* and *Alan N. Ponanski*, assistant attorneys general, with whom was *Richard Blumenthal*, attorney general, for the plaintiff.

*Ericson, Scalise & Mangan,* for the defendants.

HON. WILLIAM C. BIELUCH, JUDGE TRIAL REF-EREE. This proceeding is an appeal from the assessment of damages incident to a condemnation. As with a number of recent decisions; see, e.g., *Newington* v. *Estate of Young,* 47 Conn. Sup. 65, 777 A.2d 219 (2000); *Commissioner of Transportation* v. *Connemara Court, LLC,* 46 Conn. Sup. 623, 763 A.2d 696 (2000); *Bristol* v. *Milano,* 45 Conn. Sup. 605, 732 A.2d 835 (2000); the present case as well has also come to the court on the wrong procedural track, as a result of directions given by the court clerk on instructions from the civil court manager of the judicial branch division of court operations. It was not entered on the court records as a separate civil action and the entry fee required by General Statutes § 52-259 was not paid. Rather, the present appeal and application for review of the statement of compensation was filed, without payment of the statutory entry fee, as a further pleading in the matter, having the above title and docket number, that previously had been created for purposes of depositing with the clerk of the Superior Court, the assessed damages in the amount of $6100. See *Newington* v. *Estate of Young,* supra, 66; *Commissioner of Transportation* v. *Connemara Court, LLC,* supra, 623; *Bristol* v. *Milano,* supra, 605.

The property owners have appealed from the assessment of damages paid by the plaintiff, the commissioner of transportation (commissioner), for the partial taking by eminent domain, pursuant to General Statutes § 13a-73 (b) and (e), on May 12, 2000, of the premises hereinafter described that were found to be necessary for the layout, alteration, extension, widening, change of grade, drainage and improvement of the highways commonly known as the present Farmington Avenue (Route 4), and the present South Road (Route 531). The premises taken consist of an easement located upon land situated

in the town of Farmington, on the southeasterly side of the present Farmington Avenue (Route 4), and the southerly side of the present South Road (Route 531), described as follows and shown on the map hereinafter referred to: "A full and perpetual easement to slope for the support of the highway within an area of 6,051 square feet, more or less, located between and opposite approximate Stations 1+240 and 1+300 right, Baseline, Present Farmington Avenue (Conn. Route 4), as shown on said map.

"Said easement is taken together with a right of entry, under, over and across portions of Owners' land to install a sedimentation control system and to construct a driveway, as shown on said map, said right to terminate automatically upon completion of said work by the State.

"Said easement is more particularly delineated on a map entitled: TOWN OF FARMINGTON MAP SHOWING EASEMENT ACQUIRED FROM GARY SHEA ET AL BY THE STATE OF CONNECTICUT DEPARTMENT OF TRANSPORTATION INTERSECTIONAL IMPROVEMENTS OF CT 4, SR 531 AND SR 549 NOVEMBER 1998 JAMES F. BYRNES, JR., P.E. TRANSPORTATION CHIEF ENGINEER BUREAU OF ENGINEERING AND HIGHWAY OPERATIONS. Revised 4/99, Sheet 1 of 1 (51-249-5)."

The subject property, with the buildings thereon, known as 501 Farmington Avenue, is an irregularly shaped hexagonal lot, containing approximately 4.23 acres, with four of its six sides fronting on Farmington Avenue (Route 4), South Road (Route 531) and Birdseye Road (Route 549).[1] The partial taking of the subject property was for the purpose of reconfiguring the two separate intersections of South Road and Birdseye Road

---

[1] The "Project Map" appears to be in error insofar as it designates South Road as Route 549 and Birdseye Road as Route 531.

with Farmington Avenue, bordering and situated north of this property, respectively. As a result of this highway improvement project, South Road and Birdseye Road will no longer abut the subject property. South Road will be relocated northeasterly to the redesigned intersection of Birdseye Road with Farmington Avenue. Birdseye Road at its border with the subject property will be rerouted and relocated on a curve easterly from its former frontage with the property. Given the state department of transportation (department) considered it undesirable from a safety and traffic operational perspective to allow any future development of the subject property to access Farmington Avenue at the subject location, provision was purportedly "made in the design to allow this property to access existing or relocated Birdseye Road."

Before the taking, the department held a meeting on April 20, 1998, concerning design and rights-of-way coordination of this project with the representatives of the developer of the largest property affected by it, Farm Glen Land Holding/Metro Realty. Neither the owners of the subject property, nor their representative, were present. The written report of this meeting states: "During the meeting it was reconfirmed that most of the parcels adjacent to the relocated roadways, S.R. 531 and 549, are owned by the O'Meara Trust which is represented by the developer, Metro Realty. [Birdseye] Road (S.R. 549) is owned in fee, and South Road (S.R. 531) is owned by easement. If the roads are abandoned, the following will apply: The ROW easement (South Road) will revert to the abutters; and the ROW by fee [Birdseye Road] must first be offered to other state agencies, then to the town, and then to the public. However, at previous coordination meetings, it was determined that a land swap between the developer and the state of Connecticut would be beneficial to both parties. A vehicle for implementing this land swap

is still being researched, and a determination is pending."

On May 28, 1999, counsel for the owners of the subject property wrote to the project manager, Richard Zbrozek, requesting "a letter confirming the fact that this piece will continue to have access for vehicular traffic as well as underground utilities to the new Birdseye Road. I believe that what has been discussed is an access way over that portion of the old Birdseye Road which would not be abandoned which would lead to the new Birdseye Road." On June 9, 1999, the manager of state design responded that "provisions have been made in the design to allow this property to access existing or relocated Birdseye Road, as shown on the enclosed map." The small specific area map attached was endorsed "very, very preliminary design for driveway."

With knowledge of the proposed condemnation, on January 3, 2000, Gary Shea, Michael Shea and James Shea, known collectively as the "Seller," and Wayne C. Arute and Lori P. Arute, known collectively as the "Buyer," entered into a contract for the sale and purchase of the subject property for the total price of $275,000. The urgency of this transfer is evident in the provision for performance: "Buyer shall apply to the Town of Farmington Planning and Zoning Commission for a Zone Change, Special Permit and Site Plan Approval for said property by the second meeting in the month of March, 2000. Buyer shall receive approvals to renovate the existing structure into a commercial office space and receive approval to build two (2) additional office buildings of 6,500 square feet each on the subject property."

Other provisions of the purchase agreement are also relevant to this proceeding. Article 4 (C) states: "The Buyer's obligations are contingent upon reaching an

agreement with the State of Connecticut, Department of Transportation or State Traffic Commission, as necessary, and the neighboring property owner for access to the premises from Birdseye Road, utility easements, and drainage easements by the time Buyer applies for the zone change. The Buyer agrees to pursue any necessary approvals with due diligence." Article 9 of the purchase agreement provides: "In the event of any taking or threat of taking by condemnation . . . Buyer shall, by written notice to Seller . . . elect to: (i) terminate this Contract . . . or (ii) consummate the purchase of the Premises. If Buyer does not elect to terminate this Contract, then Seller shall on the closing date pay to Buyer all condemnation awards and compensation then received by Seller. In addition, Seller shall transfer and assign to Buyer, in form reasonably satisfactory to Buyer, all rights of Seller with respect to payment for compensation on account of such taking."

In Article 11 of the purchase agreement, entitled "Seller's Warranties, Representations and Covenants," paragraph (C) provides: "Seller has received no notice of, nor is Seller aware of, any pending, threatened or contemplated action by any governmental authority or agency having the power of eminent domain, which might result in any part of the Premises being taken by condemnation or conveyed in lieu thereof."

The "land swap" previously discussed at the aforementioned meeting between the representatives of the department and Geoffrey Sager, of Metro Realty, on April 20, 1998, culminated in an administrative settlement, dated January 3, 2000, under the provisions of General Statutes § 13a-73 (c). Section 13a-73 (c) provides in pertinent part that: "The commissioner may purchase any land and take a deed thereof in the name of the state when such land is needed in connection with the layout, construction, repair, reconstruction or maintenance of any state highway . . . provided any

such purchase of such land or land and buildings in an amount in excess of one hundred thousand dollars shall be approved by a state referee. The commissioner, with the advice and consent of the Attorney General, may settle and compromise any claim by any person, firm or corporation claiming to be aggrieved by such layout, construction, reconstruction, repair or maintenance by the payment of money, the transfer of other land acquired for or in connection with highway purposes, or otherwise."

The proposed settlement agreement was entered into by the state and Dunn-Sager Interests O'Meara Farm, LLC (Dunn-Sager), as owner and developer of major land holdings along this section of Route 4. The recommended settlement amount was stated to be "$75,000.00, plus the release of the State's interest in a parcel of land." Other important provisions of the settlement were the following: "The State has always preferred the total realignment of the Route 4, SR 531, and SR 549 intersections, but lacked adequate funding to proceed with the design and engineering phase of such a project. Dunn-Sager also favored this plan. In a show of support, they agreed to modify their future development plans to accommodate the expanded roadway improvements, together with agreeing to fund the cost of the project's design and engineering phase, in lieu of implementing the improvements stipulated under their original STC certificate.

"This major realignment project requires the acquisition of approximately four acres of land, together with various easements and temporary rights, from the Dunn-Sager organization. The project will eliminate the current 'X' configuration of the South and Birdseye Road intersections. South Road and Route 4 will be realigned into a signalized 'T' intersection, and Birdseye Road will be relocated to the south. As a result, approximately 2 acres of the existing State rights of way will

no longer be needed. Being the primary abutter, Dunn-Sager showed interest in securing all rights to this abandoned section of highway. Conceptually, Dunn-Sager believed that the two acres of abandoned roadway could be utilized as part consideration for the four acres the State needed to acquire from them."

"[Staff Appraiser] Fox postulated a significant benefit to Dunn-Sager's property as a result of the release. After the State's acquisition, Dunn-Sager's property will consist of four parcels. The largest parcel will contain over 27 acres, located on the north side of Route 4. The three remaining parcels are separated by the existing intersection of South and Birdseye Roads, on the opposite side of Route 4. Mr. Fox's release valuation proposes that by assembling the State's two acres to Dunn-Sager's three non-contiguous parcels on the south side of Route 4, a five acre stand alone parcel is created that will support office development. . . . An estimated value of the State's release parcel equal to $610,000.00 is the result of the assemblage and benefit logic."

"Extensive negotiations resulted in the following agreement: 1. [Dunn-Sager] agrees to accept the sum of $75,000.00 as full and final payment for all damages resulting from the State's acquisition, as depicted under File No. 51-249-6. This acquisition will occur upon final approval of this Administrative Settlement. 2. Upon the completion of the construction to realign Connecticut Route 4, SR 531, and SR 549, the State will convey to Dunn-Sager its interests in the approximately two-acre section of the existing roadways finally deemed in excess of the State's highway needs. Simultaneously, Dunn-Sager will grant to [Southern New England Telephone] the appropriate easement for its cable to remain in its existing location. Had this utility been ordered to relocate, the State would be exposed to $800,000.00 in relocation costs."

"To date, the Dunn-Sager organization has expended over $175,000.00 in project related design and engineering costs. . . . Your approval of the settlement is recommended." Approvals were obtained from the governor's screening committee, the state properties review board and the attorney general's office between January 13 and March 9, 2000. There was no submittal to, or approval by, a trial referee as indicated under § 13a-73 (c).

An invoice and payment voucher for closing of the settlement agreement was issued by the state on March 14, 2000, and accepted by Dunn-Sager on May 12, 2000. It confirmed "acceptance of an Administrative Settlement dated January 3, 2000 for rights, easements, and land to be acquired in four parcels totaling . . . (170,841± sq. ft.), more or less, for the intersectional improvements of CT 4, SR 531 and SR 549 as shown on a map entitled: 'Town of Farmington, Map Showing Land Acquired From [Dunn-Sager] By the State of Connecticut, Department of Transportation, Intersectional Improvements of CT 4, SR 531 and SR 549, Scale 1:500, James F. Byrnes, Jr., P.E., Transportation Chief Engineer, Bureau of Engineering and Highway Operations, Town No. 51, Project No. 51-249, Serial No. 6, Sheets 1 and 2 of 2.' [for] . . . $75,000.00.

"The State and Owner further agree in acceptance of an Administrative Settlement dated January 3, 2000, that the State will convey to [Dunn-Sager] land to be released in one parcel consisting of . . . (2.1± acres), more or less, for the intersectional improvements of CT 4, SR 531 and SR 549 as shown on a map entitled 'Town of Farmington, Map Showing Land Released to [Dunn-Sager] By The State of Connecticut, Department of Transportation, Intersectional Improvements of CT 4, SR 531 and SR 549, Scale 1:500, May, 1999, James F. Byrnes, Jr., P.E., Transportation Chief Engineer, Bureau of Engineering and Highway Operations, Town No. 51,

Project no. 51-249, Serial No. 6A, Sheet 1 of 1.' " An addendum to the invoice and payment voucher stipulated that the conveyance by the state of the 2.1 acre parcel to Dunn-Sager "will occur upon completion of Project 51-249."

On February 17, 2000, counsel for the owners of the subject property forwarded to the department an appraisal report pertaining to the subject property prepared by Scott Reckert on February 15, 2000. Based on this report, counsel requested a discussion of just compensation. The highest and best use of the property claimed, at that time, was for residential real estate development, based upon its then R-20 zone classification. After the relocation of South Road and Birdseye Road, the appraiser estimated that a potential of six building lots would be reduced to three lots, causing a loss estimate of $165,000. The department replied on March 8, 2000, as follows: "After a careful review of your submitted appraisal, it is the continued opinion that the State's formal offer of $6,100.00 is fair and equitable compensation. . . . It is the State's position that without a current Town-approved subdivision plan, your assertion of the possible utility of the subject property is unproven."

On February 23, 2000, 501 Farmington Avenue Associates, LLC, through its agent, Wayne Arute, together with Dunn-Sager, applied to the planning and zoning commission of the town of Farmington for a change of zone from R20/R40 to PR, a special permit and site plan approval for property known as 501 Farmington Avenue, the subject property, and a portion of lot 1A and lot 9, as designated on the town assessor's map. Lots 1A and 9 were owned by Dunn-Sager. Lot 1A is on the north side of South Road opposite the subject property, and lot 9 is on the east side of Birdseye Road

opposite the subject property. This application was approved by the commission on April 18, 2000, with the following conditions relevant to this proceeding: (1) the one-way access drive from Farmington Avenue shall be eliminated; and (2) the two-way access drive from Birdseye Road shall be shifted to the southernmost edge of the conservation easement.

Soon thereafter, on May 12, 2000, as hereinbefore noted, the state's invoice and payment voucher for the closing of the department's administrative settlement agreement was accepted by Dunn-Sager. On the same day, the notice of condemnation of the subject property and the assessment of damages in the amount of $6100 were filed in court and this proceeding followed.

The subject property is located on Farmington Avenue, Route 4, in the eastern section of Farmington. It adjoins the southwest quadrant of the town of West Hartford on state Routes 4 and 6 and Interstate 84, and is about two miles from the northwest quadrant of the city of New Britain in the vicinity of exit 37 from Interstate 84. It consists of a parcel of land containing 4.23 acres of land, more or less, with a two-story wood framed dwelling and three outbuildings, all of which are vacant. The site is gently sloping in grade. It was formerly a residential and farm area of town. Since the erection of the University of Connecticut Health Center and the University of Connecticut Medical and Dental Schools, along with John Dempsey Hospital on the east side of Route 4, about one mile to the north of the site, Route 4 has been transformed into an area catering to professional offices, together with a residential hotel. This progression of development has extended along Route 4 northerly to the West Hartford town line and southerly to include the subject property. These developments are accessed via Farmington Avenue, and

Route 4 connects directly to the on and off ramps of Interstate 84 about one tenth of a mile south and continues from there to the center of the town of Farmington. As noted earlier, immediately before the present condemnation action was filed in court, the property was rezoned from a residential to a PR zone with a special permit and site plan approval for development of 24,522 square feet for general office use.

In the opinion of the owners' appraiser, the highest and best use of the property is the demolition of the existing improvements and the development of the site based on the zoning approvals of the planning and zoning commission of the town of Farmington before the taking. The state's appraiser concurs in this estimate that the highest and best use of the property is its commercial development as permitted by zoning. The court agrees with this joint conclusion. Additionally, the court concurs in their sales comparison approach as appropriate to the valuation of the property.

In significant comments preliminary to his appraisal of the property, the owners' appraiser noted: "Based upon a review of the redevelopment plans, it appears the subject site will be significantly affected by the taking. Also, Birdseye and South Roads are to be eliminated as a result of this redevelopment. In the opinion of the Appraiser, these proposals will have a dramatic impact on the value of subject property. Based on a review of the proposed redevelopment plan, it appears that the elimination and rerouting of the existing roadways will result in the subject's losing all vehicular access to public roadways. The subject will retain frontage along Farmington Avenue, but will not be permitted a curb cut onto the roadway. Access to Birdseye Road will require construction of a long private driveway which will have to be shared with the adjacent property. Construction of the driveway would require the cooperation and agreement of the adjacent land owner. Due

to many uncertainties in this, the Appraiser is unable to quantify the costs of the shared driveway and the potential [effects] on marketability of the driveway."

In his market approach, the owners' appraiser made four comparisons of recent nearby sales in Farmington which he considered to be very good or reasonable indicators of value. The first sale consisted of a vacant lot, being lot #1, Birdseye Road. This was a transfer on October 17, 2000, of 0.68 acre of land located in a residential (R-80) zone in close proximity to the subject property. The site was granted a zoning variance for construction of a 6735 square foot office building with twenty-eight parking spaces. This site was also granted a use variance on September 18, 2000, for development of medical offices. The consideration was $300,000, or $10.13 per square foot. This was considered to be a very good indicator of value because of its recent date, proximity to the subject property and similar development potential.

The second comparable sale consisted of a 11.92 acre parcel at 5 Batterson Park Road sold on June 21, 1999, for $2,600,000, or $5.01 per square foot. This sale was utilized because of its location in a professional office zone and its similar development potential to the subject property.

The third comparable sale consisted of a 4.2 acre lot at 1 Batterson Park Road located in a business zone (BR). This property sold on June 16, 1998, for $2 million, or $10.93 per square foot, and was recently improved by a hotel. The final comparable sale was a transfer of three parcels of land containing a total of 16.5 acres at 29 Batterson Park Road, 1023 Fienemann Road and 1035 Fienemann Road, and improved with older, single-family dwellings. This property was located in R and BR zones. It transferred on June 16, 1998, for a consideration of $2,500,000, or $3.48 per square foot. This sale

was utilized because it had development potential similar to that of the subject property.

Based on these comparable sales, which ranged in value from $3.48 to $10.93 per square foot, and considering the subject property's location, zoning and size, the owners' appraiser estimated the before taking value of the subject property to be $6 per square foot of land. This estimate resulted in a total value of $887,058, which he rounded to $890,000.

The second phase of his valuation before taking took account of estimated development costs, which included razing the existing structures and clearing the site, as well as engineering costs and other fees and expenses. He estimated costs associated with the removal of the existing structures at $12 per square foot for a rounded total of $42,000. For the additional development costs, he allowed twenty-five cents per square foot. With these deductions, he estimated the net value of the subject property before taking to be $811,000, rounded to $810,000.

In estimating the value of the property after taking, the appraiser predicated that "subsequent to the taking, the subject [property] will not have access to a public road. The owner of the subject [property] will have to negotiate with the adjacent parcel owner for a shared driveway to Birdseye Road. Due to the many variables and uncertainties, the Appraiser cannot quantify the costs of the shared driveway nor can the Appraiser assume that [an] amicable agreement can be reached. Therefore, the Appraiser cannot assume access to Birdseye Road. The lack of access to a public roadway will have a tremendous impact on the property and will yield the site effectively nonuseable. Without access to a public roadway, the appeal and marketability of the property would be severely diminished. The remaining value of the property would be limited to a speculative

value to an investor who believes he can acquire access to a public road. In the opinion of the Appraiser, a prudent investor would be willing to risk [an] investment of ten to twenty percent of the value of the site on his ability to develop the site. For purposes of this valuation, the Appraiser feels a rate of fifteen percent is reasonable to determine the speculative value of the site. The Appraiser therefore, estimates the 'After taking' [value] of the site at $121,650, say $120,000." Subtracting this valuation from the "before taking" value, he estimated the total loss to the subject property from the taking to be $691,000.

Cynthia L. Bezz appraised the taking of the slope easement for the state. The subject property was described as a 4.23 acre, more or less, parcel of commercial land located on the southeast corner of Farmington Avenue, Route 4, and South Road, having a frontage of 247.15 feet, more or less, on Route 4, and a total angular frontage of 328.46 feet, more or less, on the southerly side of South Road. It is noted that neither the frontage on Birdseye Road, nor access to it, was given in the text or shown on the plot map of her appraisal report, nor considered in her valuation of the subject property.

Three recent sales of commercially zoned land in Farmington were reviewed in her comparable sales analysis. The first sale was that of 1 Batterson Park Road, a sale also used by the owners' appraiser. This property consisted of a 4.2 acre parcel of land, south of the subject property, that sold for $2 million on June 16, 1998. The net adjustment of value was downward 50 percent, reducing the per acre price to $238,094. The second comparable sale consisted of a 1.29 acre parcel of land, 4.81 miles southwest of the subject property at 362 Scott Swamp Road, that sold on June 19, 2000, for $435,000. After allowing for demolition costs incurred to raze a home on the site, the net adjustment was downward 35 percent, reducing the per acre price to

$219,187. The third comparable sale consisted of a two acre parcel of land, 0.83 mile south of the subject property at 360 Colt Highway, that sold on June 16, 1998, for $455,000. The net adjustment of value was downward 15 percent, reducing the per acre price to $193,375.

The adjusted values ranged from $193,375 to $238,094 per acre. Her estimated unit value of the subject property before taking is $215,000 per acre, or a total value for 4.23 acres, more or less, of $909,450.

In her after taking analysis, the same three sales were utilized. No additional adjustments, however, were made in the after taking scenario. The resulting unit value, therefore, remained the same as before the taking, $215,000. Her computation of the after taking value was as follows: easement area of approximately 6051 square feet equals approximately 0.14 acre, leaving approximately 4.09 acres unencumbered, for a value at $215,000 per acre of $879,350; allowing 50 percent loss in value because of the slope easement on approximately 0.14 acre, the unencumbered portion was valued at $15,050, for a total after taking value of $894,400. Deducting this sum from the before taking value of $909,450, Bezz calculated the taking damages at $15,050, which she rounded to $15,100. At no point in her appraisal did Bezz recognize, reference or acknowledge the loss of access to or from the subject property to Birdseye Road.

The owners in their claims have observed that no metes and bounds description of the taking was provided by the state, and the taking map does not show the entire subject property owned by them. The adjoining properties are being developed and owned by entities which have been variously known as Metro Realty, Jeffrey Sager and Peter Dunn, Dunn-Sager, Sager-Dunn and Metropolitan Realty. The state was "partnered" with the developers of the adjoining properties, who were

responsible for paying for the design phase of the project, while the department was responsible for construction of the project. As part of its agreement with these developers, the state is "releasing" part of the former Birdseye Road to Dunn-Sager, the adjoining landowners. "This would more appropriately be deemed a granting as the state is in fact transferring a fee interest in the property to Dunn-Sager." The state reportedly acquired rights to Birdseye Road in fee, while South Road was acquired in easement, both from the abutting landowners. The reported method of acquisition appeared not to be in dispute by the parties. After the taking, it was claimed, the only highway bounding the subject property is Farmington Avenue, to which access was eliminated by the zone change prior to the taking. No recorded or executed documents reserving access rights for the subject property to Birdseye Road are evident.

The owners further claim that the gross inadequacy of the compensation of $6100 is conceded by the state's appraiser in her valuation of $15,100, and this was reached by her arbitrary discount of 50 percent for the slope rights. Consideration was neither given to loss of frontage or loss of access, nor limitation or impairment of access in her appraisal. The state has maintained the position that the sole thrust of this matter is the valuation of a slope rights easement, overlooking any and all damages which will foreseeably follow from the taking, including any damage to the remainder which is a necessary, natural and proximate result of the taking. The greater issue is whether the taking has left the subject property without highway access or with impaired and restricted access.

The owners also claim that the state has not adequately reserved any right-of-way for the use and benefit of the subject property along the discontinued Birdseye Road. The failure to include the reservation of such a

right in fact leaves the property landlocked, with no marketable means of ingress or egress. The state's claim of a possible reservation of a fifty-five foot strip for access to Birdseye Road in the swap agreement made with the adjoining owners is questioned by the owners as being beyond the scope of the state's taking. The speculative nature of future action by either the state or the adjoining owners, or both, is a cloud upon the title to their property and must be considered in its effect on the fair market value of the property at the time of taking. No consideration for such restriction and impairment of access to Birdseye Road was given in the state's appraisal. More importantly, the necessary documentation for a reservation of access to Birdseye Road was not made in the certificate of taking and the taking map.

The owners admit they have had discussion with the state's engineer about possible access to Birdseye Road, but this access is uncertain, subject to change, and also subject to agreement with the Dunn-Sager developers as to the location of a future mutual driveway going partly over the lands given to them by the swap agreement. The lack of official affirmation of the owners' access to Birdseye Road impinges on the fair market value of the subject property after the taking. "A buyer of a property would need unequivocal access to its property or affirmative assurances that guarantee a method for access. Failing to have such access would impair the consideration a buyer would be willing to pay for a property. . . . The unfortunate result of the State's Actions, would be that the granting of any access to the Appellants property would be [dependent] upon the adjoining landowner, who would have to share access with the Appellants. . . . The State has admitted that it had placed the Appellants in the position of negotiating with the adjoining landowner prior to allowing an approval for any access."

The owners also question the legality of the "land swap" with the payment of $75,000 to Dunn-Sager. The state claims this was authorized by the provisions of § 13a-73 (c). Section 13a-73 (c) provides in pertinent part: "The commissioner may purchase any land and take a deed thereof in the name of the state when such land is needed . . . provided any purchase of such land or land and buildings . . . shall be approved by a state referee. The commissioner, with the advice and consent of the Attorney General, may settle and compromise any claim by any person, firm or corporation claiming to be aggrieved by such layout . . . by the payment of money, the transfer of other land acquired for or in connection with highway purposes, or otherwise."

To this argument, the owners reply: "If in fact this is the applicable statute, approval is required by the State by a trial referee, if the value of the transaction is in excess of $100,000.00. The total value of the purported transaction was in excess of $100,000.00, when one considers the quantity of land included, in addition to the payment of cash. No such approval was ever sought nor received. In addition, the Appellants are an aggrieved party as land that should revert to them is being transferred to a third party." The state's "land swap" was without such statutory approval and ignored the method for discontinuance of a public roadway. The owners, as the abutting landowners, presumptively are the owners to the center of the roadway, and have been deprived of their property rights in the roads that will be abandoned by the state and are a part of its "land swap." The validity of the state's agreement with Dunn-Sager is not before this court. Its effect, however, on the valuation of the subject property must be reviewed by the court.

In discrediting the state's valuation of the subject property, the owners attack the appraisal as being an improper mathematical calculation based solely on

acreage, rather than the required before and after valuation of the entire parcel. Further, the state's appraisal discounts at a rate of 50 percent the total loss to the owners without any support for such a reduction. The owners now lack the ability to use the land taken for slope rights for any uses inconsistent with the slope required and maintained by the state. This restriction upon the fee ownership is significantly obvious. Notwithstanding their attack upon the bottom line of the state's valuation of damages in this taking, the owners emphasize in their argument that "[i]t is worth noting that both appraisers place a similar before value on the property in the range of $900,000.00."

The final claim of the owners relevant to the issue of damages from the taking concerns the applicability of General Statutes § 13a-55 to the discontinued or abandoned portions of the relocated South and Birdseye Roads. Section 13a-55 provides in pertinent part that "[p]roperty owners bounding a discontinued or abandoned highway, or a highway any portion of which has been discontinued or abandoned, shall have a right-of-way for all purposes for which a public highway may be now or hereafter used over such discontinued or abandoned highway to the nearest or most accessible highway . . . ."

The state maintains that the premise of the owners' appraisal is incorrect and misleading. The department has not denied access from the subject property to Birdseye Road. Instead, it claims, the department reserved a fifty-five foot corridor located at the southernmost end of the frontage on the former Birdseye Road for access to the relocated highway. The driveway to the new Birdseye Road was preserved by the department as part of the project and was available to the owners at the time of the taking.

Ted J. DeSantos, project manager with Fuss & O'Neill, Inc., consulting engineers, was engaged as a traffic and

transportation engineer by both parties in this matter. He testified that this corridor, fifty-five feet in width at the property line, was reserved in the state's ownership because there was no guarantee that Metro Realty would go forward with its proposed development, or when it would do so, thereby allowing access to a state road from the subject property at the time of taking. Corroboration of this was in the issuance on September 18, 2000, after the taking, of an encroachment permit from the bureau of highways to construct an exclusive driveway to the original and the proposed, relocated Birdseye Road. The driveway permitted by this authorization was never built by the owners. Had it been constructed by them, the state, as part of the project, would have extended it eventually to the proposed roadway relocation in accordance with its policy. No further documentation would have been required for such right of access to the new highway. The department never restricted the owners from a single driveway, but, to the contrary, reserved a fifty-five foot corridor for them to construct a driveway, allowing them access to the original and relocated Birdseye Road.

The state further claims that the owners' later difficulties and inability to obtain a satisfactory reciprocal easement agreement with Dunn-Sager for access to the relocated Birdseye Road was unrelated to the state's taking and its consequential damages to the subject property. The genesis of this problem was in the owners' "partnership" with Dunn-Sager in their successful joint application before the taking to the planning and zoning commission of the town of Farmington for the zone change, special permit and site plan approval. The first condition imposed was the elimination of the one-way access drive from Farmington Avenue. The second condition, relevant to access from Birdseye Road, required that the combination two-way driveway for the approved properties "be shifted to the southernmost

edge of the conservation easement." In the zone change from R20/R40 to PR, special permit and site plan approval for general office use of 24,522 square feet of their combined properties before the taking, the town imposed the restriction upon the owners of the properties affected that there had to be a single combined driveway for all three properties. Only one driveway was permitted by the town zoning authority for all three adjoining parcels rezoned at the owners' joint request, thereby restricting their access to Birdseye Road prior to the taking of the subject property. No further restriction or limitation of this access was made by the state or its taking. In the state's analysis, the owners of the subject property at the time of taking had access to relocated Birdseye Road, but chose not to take advantage of their right to install a single driveway. Their problem of further access was of their own making, and not created by the state's taking.

In their rebuttal to the state's claims, the owners observed that the state has conceded that there is a considerable amount of property or distance between the relocated Birdseye Road and the subject property, and that the only access after the taking would be by a long private driveway. "The length of any such potential driveway is absolutely a function of the State's taking, as the project relocates Birdseye Road considerably away from the subject property. The State wants to ignore this fact. The State's project is at best making access much more difficult and at worst is completely destroying the access to the property." Further, the state has failed to address the issue that it took portions of the abandoned South and Birdseye Roads that should legally go to the owners under the law and gave them to the adjoining owners. The state cannot show any authority for this unconstitutional deprivation of the owners' property. The owners maintain that the state's

failure to consider all of the depreciating factors affecting the subject property caused by the taking have resulted in its inadequate valuation of the damages suffered by them.

Under the provisions of our eminent domain laws, title 13a, chapter 238, entitled "Land Acquisition and Disposal," the commissioner has authority to purchase by deed; General Statutes § 13a-73 (c); or take by eminent domain; General Statutes § 13a-73 (b); "real property," defined as including "land and buildings and any estate, interest or right in land." General Statutes § 13a-73 (a). Both methods may not be pursued at the same time. When the legislature gave the commissioner power to "take" any land he finds necessary for the layout, alteration, extension, widening, change of grade or improvement of any state highway, it must be assumed that it intended a taking of an easement for highway purposes; otherwise, it would have specified more particularly the estate he was authorized to acquire by condemnation. "This is a less estate than the fee obtained by warranty deed. If the owner of an easement in land acquires the fee, his lesser estate is merged therein and the whole legal title is vested in the grantee." *Kratochvil* v. *Cox*, 129 Conn. 246, 249–50, 27 A.2d 382 (1942).

In *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 440, 576 A.2d 503 (1990), "[t]he defendant condemned an easement 'for highway purposes and its appurtenances' running along the entire length of the plaintiff's frontage on Route 7." The plaintiff contended that since the language of the notice of condemnation afforded the defendant broad rights for the use of the property, the defendant actually acquired full fee simple title to the subject premises. The court disagreed, stating, "when the [commissioner] condemns property pursuant to the statute authorizing takings for highway improvements, the property acquired is an easement.

*Arborio* v. *Hartford Electric Light Co.*, 130 Conn. 592, 595, 36 A.2d 384 (1944); *Kratochvil* v. *Cox*, [supra, 129 Conn. 249]. Moreover, the plaintiff has retained substantial beneficial rights to the property. . . . [T]he plaintiff can make full use of the easement area for his own purposes, provided that those uses are not inconsistent with the defendant's easement." *Alemany* v. *Commissioner of Transportation*, supra, 442.

An abutting owner is presumed under the law of this state, when no evidence has been offered to the contrary, as here, to own the fee of the land to the center of the highway. As to the land within the limits of South Road and Birdseye Road at the time of taking, therefore, the owners, as an abutting owner, had all rights not incompatible with the public easements to the center of the highways. *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, 142 Conn. 349, 355, 114 A.2d 216 (1955); *Allen* v. *Mussen*, 129 Conn. 151, 155, 26 A.2d 776 (1942); *State* v. *Muolo*, 119 Conn. 323, 326, 176 A. 401 (1935). " 'A highway is nothing but an easement, comprehending merely the right of all the individuals in the community to pass and repass, with the incidental right in the public to do all of the acts necessary to keep it in repair.' *Peck* v. *Smith*, 1 Conn. 103, 132 [1814]; *Newton* v. *New York, N.H. & H.R. Co.*, 72 Conn. 420, 426, 44 A. 813 [1899]. The easement in the public does not comprehend any interest in the soil or give the public the legal possession of it. The right of freehold is not touched by establishing a highway. It continues in the original owner of the land in the same manner as before the highway was established, subject to the easement. *Peck* v. *Smith*, supra [132]. The adjoining proprietors have a right to every use and profit which can be derived from it consistent with the easement. The soil of a highway descends to heirs and passes to grantees as an appurtenant to the land adjoining, and whenever the highway is discontinued, the adjoining

proprietors hold the land discharged of the easement. *Knothe* v. *Zinzer*, 96 Conn. 709, 713, 115 A. 477 [1921]; *Peck* v. *Smith*, supra, 146." *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 355–56.

Under our law, "[i]nstead of creating a fee, the taking of the highway creates two easements: the public easement of travel, that permits the general traveling public to pass over the highway at will, and the private easement of access, that permits landowners who abut the highway to have access to the highway and to the connecting system of public roads. . . . A landowner who, as a result of governmental action, suffers a total and permanent loss of his right of access to the public way adjacent to his land and to the system of public roads is entitled to recover damages." (Citations omitted.) *Luf* v. *Southbury*, 188 Conn. 336, 341–42, 449 A.2d 1001 (1982).

Section 13a-55 provides: "Property owners bounding a discontinued or abandoned highway, or a highway any portion of which has been discontinued or abandoned, shall have a right-of-way for all purposes for which a public highway may be now or hereafter used over such discontinued or abandoned highway to the nearest or most accessible highway, provided such right-of-way has not been acquired in conjunction with a limited access highway." The terms "discontinuance" and "abandonment" are not synonymous as applied to highways. A highway is "discontinued" by direct action through governmental agencies; a highway is "abandoned" through nonuse by the public for a long period of time with the intention to abandon it. Mere nonuse is not enough; there must be an intent to abandon together with the nonuse. *Marrin* v. *Spearow*, 35 Conn. App. 398, 403–405, 646 A.2d 254 (1994). The portions of South Road and Birdseye Road formerly abutting the subject property on the north and east, respectively, have been discontinued by their relocation away from the owners'

borders. The action of the commissioner in relocating portions of the two highways away from the subject property was taken under the authority of General Statutes § 13a-56, which permits the relocation of a highway for the purpose of straightening or removing any dangerous location thereon.

After the enactment of § 13a-55 in 1959, the public easement over discontinued or abandoned highways ceases, but the private easement remains. The abutting owners now continue to have an easement of access over the discontinued highway. Insofar as the private access of necessity includes the right to travel over and to improve the existing roadbed, the statute, on its face, operates to preserve, rather than to destroy the abutter's right of access. *Luf* v. *Southbury*, supra, 188 Conn. 344. This private right of access, however, is subject to private improvements to the former roadbed to utilize and maintain such statutory access. Id., 348; *Double I Ltd. Partnership* v. *Plan & Zoning Commission*, 218 Conn. 65, 74, 588 A.2d 624 (1991); *Gagnon* v. *Municipal Planning Commission*, 10 Conn. App. 54, 68–69, 521 A.2d 589, cert. denied, 203 Conn. 807, 525 A.2d 521 (1987).

"The function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken. . . . Although the market value of the taken property is ordinarily the most appropriate measure of fair compensation . . . other measures may be appropriate when the fair market value measure of damages does not fully compensate the owner. . . . [T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." (Citations omitted;

internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, supra, 215 Conn. 444.

Our courts have consistently departed from the fair market value measure of damages in cases of partial taking. "When only a portion of a party's property is taken, the landowner is entitled not only to compensation for the value of the property taken, but also to severance damages for the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes. . . . To ensure that severance damages are included in the trial court's assessment, damages should be calculated by the 'before and after rule,' under which '[t]he proper measure of damages is the difference between the market value of "the whole tract" as it lay before the taking and the market value of what remained of it thereafter.' " (Citations omitted.) Id., 444–45.

"[It is] also established, in highway easement cases, that the landowner is entitled to compensation for severance damages that might result from prospective uses of the easement as well as the damages immediately flowing from the presently contemplated highway improvement project for which the land was taken. . . . [I]t is proper to consider such use of the land taken as would in any reasonable anticipation be most disadvantageous to the landowner. . . . Moreover, the landowner need not demonstrate that a more detrimental future use is likely to occur; all possibilities that would affect market value are relevant." (Citations omitted; internal quotation marks omitted.) Id., 445.

"[I]n determining market values in awarding damages for land taken, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . unless, indeed, the considerations advanced are not a necessary, natural or proximate result of the taking.

. . . The determination of the damages to be paid requires the consideration of everything by which the value is legitimately affected . . . but considerations that may not reasonably be held to affect market value are excluded. . . . The damages to be paid are to be determined as of the time of taking." (Citations omitted; internal quotation marks omitted.) *Andrews* v. *Cox*, 127 Conn. 455, 458, 17 A.2d 507 (1941).

"[E]xpenses which are reasonably necessary to adapt the remaining land to use in view of changes to be made in the land taken may properly enter into the damages to be awarded. . . . [S]uch expenses are not recoverable as such but are evidence of elements in the decrease in market value, of which they may be an accurate measure. . . . [P]hysical changes in the land taken involved in the improvement as contemplated, are [also] to be considered." (Citations omitted.) Id., 459–60. "Applying the principle that the determination of market value requires a consideration of all those elements which an owner or prospective customer could reasonably urge as affecting the fair market price of the land, it becomes at once apparent that to restrict consideration to future changes which are reasonably probable is to rule out changes which, though not within that category, are so possible of occurrence that they might reasonably be held to affect present market value. Such changes may properly be considered." Id., 462.

The judgment of this court should merely determine the amount of severance damages for the taking of the land by the "before and after" difference in valuation of the subject property, and not by the recovery of the amount of damages found due. Id., 464.

The elements of the owners' damage due to the state's taking on May 12, 2000 are: (1) a full and perpetual easement to slope for the support of Farmington Avenue, Route 4, within an area of 6051 square feet, more

or less, and potential loss of three trees and plantings thereon or adjacent thereto; (2) an extension of such permanent slope easement to the center line of abandoned South Road formerly bordering the easement area taken; (3) the installation of a sedimentation control system 269 feet, more or less, in length on Farmington Avenue and at the foot of the permanent slope easement area; (4) the loss of usable frontage along the Farmington Avenue border of the full and perpetual slope easement; (5) the restriction on use of the land taken for the full and perpetual slope easement and installation of the sedimentation control system; (6) loss of highway frontage on South Road and Birdseye Road; (7) construction of a private driveway from the subject property to the relocated Birdseye Road; (8) impairment and limitation of access to Birdseye Road; and (9) creation of a cloud upon the title of the subject property by the state's "land swap" agreement to convey to Dunn-Sager title to one-half of the abandoned South Road and Birdseye Road bordering the subject property, foreseeably compelling expensive complex litigation for its removal.

After viewing the site of the subject property, and after giving due consideration to the opinions of expert witnesses and to a knowledge of the elements that establish value, the court finds that the before taking value of the subject property was $900,000, and that the after taking value is $789,000, resulting in damages of $111,000. Damages, therefore, are assessed at $111,000.

Judgment may enter for the owners in the amount of $111,000, being $104,900 in addition to the $6100 previously deposited with the clerk of court, with interest on such excess at 8 percent per annum from the date of taking on May 12, 2000, to the date of payment, together with costs and a reasonable appraisal fee of $2000.